**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | |
|---|---|
| VERONICA HUAMANI, on behalf of herself and all others similarly situated, | **CASE NO: 4:23-cv-67** |
| Plaintiff, | **CLASS ACTION** |
| v. | **JURY TRIAL DEMANDED** |
| R&N CORPORATION OF VIRGINIA d/b/a CREDIT CONTROL CORPORATION, | |
| Defendant | |

## CLASS ACTION COMPLAINT

Plaintiff Veronica Huamani, individually and on behalf of all others similarly situated, brings this action against Defendant R&B Corporation of Virginia, d/b/a Credit Control Corporation ("Defendant" or "CCC"). Plaintiff seeks to obtain damages, restitution, and injunctive relief for the Class, as defined below, from CCC. Plaintiff makes the following allegations upon information and belief, except as to her own actions, the investigation of her counsel, and the facts that are a matter of public record.

## INTRODUCTION

1.     This class action arises out of the recent data breach on CCC's network that resulted in unauthorized access to highly sensitive personally identifiable information ("PII") of approximately 286,699 individuals. As a result, Plaintiff and Class Members suffered ascertainable losses in the form of the loss of the benefit of their bargain, out-of-pocket expenses, and the value of their time reasonably incurred to remedy or mitigate the effects of the attack, emotional distress,

and the imminent risk of future harm caused by the compromise of their sensitive personal information.

2.      CCC is a debt collector located in Newport News, Virginia.

3.      According to CCC, the highly sensitive personally identifiable information that was subject to "unauthorized access" in the Data Breach included: first and last names, date of birth, and Social Security numbers (collectively "PII").

4.      The Data Breach was a direct result of CCC's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect consumers' PII. CCC itself has acknowledged that it first discovered the Data Breach on or around March 7, 2023, but it has only recently begun contacting Class Members starting on May 15, 2023.

5.      CCC's notice[1] provided scant detail, particularly considering the size and scope of the Data Breach and the sensitivity of Plaintiff's and Class Members' compromised information. CCC's notice states, in relevant part, that it "discovered unauthorized access to its network" on or around September 27, 2022. It went on to state that it "became aware of unusual activity and promptly isolated the systems, and, with the assistance of third-party forensic specialists, commenced a comprehensive investigation." As a result of the investigation, CCC reports that certain files were copied from our network including information involving: "name, Social Security number, patient account balance and patient account number."

6.      CCC's notice did not disclose how it discovered the unauthorized access, the means and mechanisms of the unauthorized access, the reason for its nearly two month delay in notifying Plaintiff and the Class of the Data Breach after learning that PII was impacted, how CCC

---

[1]      *See* Credit Control Corporation Notification Letter, https://www.mass.gov/doc/assigned-data-breach-number-29610-rb-corporation-of-virginia-dba-credit-control-corporation/download

determined that PII was "subject to unauthorized access," and, importantly, what steps CCC took following the Data Breach to secure its systems and prevent future unauthorized access.

7.      According to the Office of the Maine Attorney General, who CCC was required to notify, the Data Breach affected approximately 286,699 individuals.

8.      The Data Breach was a direct result of CCC's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect individuals' PII from the foreseeable thread of a cyberattack.

9.      By taking possession and control of Plaintiff's and Class Members' PII for its own pecuniary benefit, CCC assumed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard Plaintiff's and Class Members' PII against unauthorized access and disclosure. CCC also had a duty to adequately safeguard this PII under industry standards and duties imposed by statutes, including Section 5 of the Federal Trade Commission Act ("FTC Act"). CCC breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect patients' and other individuals' PII from unauthorized access and disclosure.

10.     The exposure of a person's PII through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. As a result of the Data Breach, Plaintiff and Class Members are at imminent and substantial risk of experiencing various types of misuse of their PII in the coming years, including but not limited to, unauthorized access to personal accounts, tax fraud, and identity theft.

11.    Mitigating that risk, to the extent it is even possible to do so, requires individuals to devote significant time and money to closely monitor their credit, financial accounts, and email accounts, and take several additional prophylactic measures.

12.    There has been no assurance offered by CCC that all impacted PII or copies thereof have been recovered or destroyed.

13.    As a result of CCC's inadequate security and breach of its duties and obligations, the Data Breach occurred, Plaintiff and over 286,000 Class Members, suffered injury and ascertainable losses in the form of the loss of the benefit of their bargain, out-of-pocket expenses, loss of value of their time reasonably incurred to remedy or mitigate the effects of the attack, the diminution in value of their personal information from its exposure, emotional distress, and the present and imminent risk of fraud and identity theft caused by the compromise of their sensitive personal information. Plaintiff's and Class Members' sensitive personal information—which was entrusted to CCC, its officials, and its agents—was compromised and unlawfully accessed due to the Data Breach.

14.    CCC disregarded the rights of Plaintiff and Class Members by, *inter alia*, failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard PII of individuals who used CCC's services; failing to take standard and reasonably available steps to prevent the Data Breach; failing to properly train its staff and employees on proper security measures; and failing to provide Plaintiff and Class Members prompt and adequate notice of the Data Breach.

15.     The security of Plaintiff's and Class Members' identities is now at risk because of CCC's wrongful conduct as the PII that CCC collected and maintained is now in the hands of data thieves. This present risk will continue for the course of their lives.

16.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to actual fraud and identity theft as well as a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against further fraud and identity theft.

17.     Plaintiff and Class Members may also incur out of pocket costs for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

18.     Plaintiff and Class Members will also be forced to expend additional time to review credit reports and monitor their financial accounts for fraud or identity theft. Due to the fact that the exposed information potentially includes Social Security numbers ("SSNs") and other immutable personal details, Plaintiff and Class Members will be at risk of identity theft and fraud that will persist throughout the rest of their lives.

19.     Plaintiff brings this Class Action Complaint for Defendant's failure to comply with industry standards to protect their information systems that contain PII and Defendant's failure to provide timely and adequate notice to Plaintiff and other Class Members that their PII had been compromised.

20.     Plaintiff, individually and all others similarly situated, bring claims for negligence; negligence *per se*; breach of fiduciary duty; unjust enrichment; breach of implied contract; and breach of contracts to which she was an intended third party beneficiary.

21.     Social Security numbers are particularly valuable to criminals. This information can be sold and traded on the "dark web" black market. The loss of a Social Security number is particularly troubling because it cannot be easily changed and can be misused in a range of nefarious activities, such as filing fraudulent tax returns to steal tax refund payments, opening new accounts to take out loans, and other forms of credit and identity theft.

22.     Plaintiff seeks, among other things, damages and injunctive relief requiring Defendant to fully and accurately disclose the PII and other information that has been compromised; to adopt reasonably sufficient security practices and safeguards to protect Plaintiff's and Class Members' PII from unauthorized disclosures in order to prevent incidents like the Data Breach from reoccurring in the future, and to safeguard the PII that remains in Defendant's custody.

23.     Plaintiff further seeks an order requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members for a period of time to be determined at trial, as Plaintiff and Class Members are at risk and will continue to be at an increased risk of identity theft due to the unauthorized disclosure of their PII as a result of CCC's conduct described herein.

## PARTIES

### A. Plaintiff

24.     Plaintiff Veronica Huamani is a resident of Woodbridge, Virginia. Ms. Huamani was a patient at the Sentara Health System and was subsequently billed by R&C Corporation/Credit Control Corporation. She received a letter dated May 15, 2023 from CCC advising that her Social Security number, among other information, was compromised in the data

breach. Since the breach, a Bank of America account was opened in her name and without her authorization. Ms. Huamani estimates that she has spent at least 10 hours dealing with the aftermath of the breach.

**B. Defendant**

25.     Defendant R&B Corporation of Virginia d/b/a Credit Control Corporation is a debt collector with its principal place of business at 11821 Rock Landing Dr, Newport News, VA 23606.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this controversy under the Class Action Fairness Act, pursuant to 28 U.S.C. § 1332(d)(2). The amount in controversy in this class action exceeds $5,000,000, exclusive of interest and costs, and there are numerous Class Members who are citizens of states other than Defendant's state of citizenship.

27.     This Court has personal jurisdiction over CCC because it is authorized to and does conduct substantial business in this District and is a citizen of this District by virtue of its principal place of business being located in this District.

28.     Venue is proper in this District, pursuant to 28 U.S.C. § 1391(a)(1), because a substantial part of the acts, omissions, and events giving rise to Plaintiff's claims occurred in Newport News, VA, which is in this District.

## FACTUAL ALLEGATIONS

**A.     Background**

29.     Defendant CCC is a debt collector located in Newport News, Virginia. CCC has inexplicably collected, stored, and failed to protect the highly sensitive PII of over more than 286,000 individuals.

30.     In its Notice Letters sent to Attorneys General, CCC claims that it "takes this event and the security of information in our care seriously…"

31.     Plaintiff and the Class Members, as current or former customers of CCC, reasonably relied (directly or indirectly) on this sophisticated debt collector to keep their sensitive PII confidential; to maintain its system security; to use this information for business purposes only; and to make only authorized disclosures of their PII. People demand security to safeguard their PII, especially when Social Security numbers are involved as here.

32.     CCC had a duty to adopt reasonable measures to protect Plaintiff's and Class Members' PII from involuntary disclosure to third parties and as evidenced by the Data Breach, it failed to adhere to that duty.

33.     Plaintiff and Class Members provided their PII to CCC with the reasonable expectation and mutual understanding that it would comply with its obligations to keep such information confidential and secure from unauthorized access.

34.     Plaintiff and Class Members' PII was provided to CCC in conjunction with the type of work CCC performs as a debt collector.[2]

35.     However, CCC failed to secure the PII of the individuals that provided it with this sensitive information.

36.     CCC's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches preceding the date it disclosed the incident.

**B.     The Data Breach and Notice Letter**

37.     In CCC's May 15, 2023 Letter to Plaintiff and Class Members, as well as in a "Notice of Data Security Incident" posted to their website, CCC announced that on or around

---

[2]     *Id.*

March 7, 2023, CCC discovered "unauthorized access" to their network and engaged third-party specialists to conduct a forensic investigation.

38.     CCC's investigation determined that certain sensitive information kept in the normal course of business was subject to this "unauthorized access."

39.     CCC has stated the information believed to be at risk includes "names, Social Security number, patient account balance and patient account number."

40.     Once CCC discovered that certain files may have been accessed by an "unauthorized party," CCC undertook a review process to identify what personal information was present. CCC completed that review on March 14, 2023.

41.     PII pertaining to Plaintiff, including Social Security numbers, were part of the data acquired by the "unauthorized party" from CCC's systems in the Data Breach.

42.     Despite being aware of the Data Breach on March 7, 2023, CCC failed to take any action to notify Plaintiff or other Class Members of this breach until at least May 15, 2023.

43.     CCC failed to take appropriate or even the most basic steps to protect the PII of Plaintiff and other Class Members from being disclosed.

44.     In addition, CCC consulted with their own "IT team" as well as "third party forensic and legal specialists" to assist its "investigation." Additional items of PII as well as other facts surrounding the Data Breach may be uncovered or have already been uncovered and not yet publicly disclosed.

45.     CCC's Notice Letter and Notice of Data Security Event have notably omitted any change to their data security or retention policies. These are steps that should have been employed in the first place-and which would have prevented or limited the impact of the Data Breach.

46.     As a result of the Data Breach, Plaintiff and Class Members have been and must

continue to be vigilant and review their credit reports for incidents of identity theft, and educate themselves about security freezes, fraud alerts, and other steps to protect themselves against identity theft.

### C.    CCC Failed to Comply with FTC Guidelines

47.    CCC was prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

48.    The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

49.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[3] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from

---

[3]    *See* ECF No. 1-27, *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016).

the system; and have a response plan ready in the event of a breach. *Id.*

50.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

51.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

52.    These FTC enforcement actions include actions against healthcare providers and partners like CCC. *See, e.g., In the Matter of Labmd, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.")

53.    CCC failed to properly implement basic data security practices.

54.    CCC's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

55.    CCC was at all times fully aware of the obligation to protect the Private Information of customers and patients. CCC was also aware of the significant repercussions that would result

11

from its failure to do so.

56.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice that violates the FTC Act.

**D.  CCC Failed to Comply with Data Security Industry Standards**

57.    As shown above, experts studying cybersecurity routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

58.    Defendant is aware of the importance of safeguarding Plaintiff's and Class Members' PII, that by virtue of their business—as a higher education institution—they place Plaintiff's and Class Members' PII at risk of being targeted by cybercriminals.

59.    Defendant is aware that the PII that they collect, organize, and store, can be used by cybercriminals to engage in crimes such as identity fraud and theft using Plaintiff's and Class Members' PII.

60.    Because Defendant failed to implement, maintain, and comply with necessary cybersecurity requirements, as a result, Defendant was unable to protect Plaintiff's and Class Members' information and confidentiality, and protect against obvious and readily foreseeable threats to information security and confidentiality.

61.    As a proximate result of such failures, cybercriminals gained unauthorized access to Defendant's network and acquired Plaintiff's and Class Members' PII in the Data Breach without being stopped.

62.    Defendant was unable to prevent the Data Breach and was unable to detect the unauthorized access to vast quantities of sensitive and protected files containing Plaintiff's and Class Members' PII.

63.    Commonly accepted data security standards among businesses and higher education institutions that store personal information, such as the PII involved here, include, but are not limited to:

a.    Maintaining a secure firewall configuration;

b.    Monitoring for suspicious or irregular traffic to servers;

c.    Monitoring for suspicious credentials used to access servers;

d.    Monitoring for suspicious or irregular activity by known users;

e.    Monitoring for suspicious or unknown users;

f.    Monitoring for suspicious or irregular server requests;

g.    Monitoring for server requests for personal and financial information;

h.    Monitoring for server requests from VPNs; and

i.    Monitoring for server requests from Tor exit nodes.

64.    The U.S. Federal Trade Commission ("FTC") publishes guides for businesses for Cybersecurity (*Start with Security: A Guide for Business*, (June 2015)) and protection of personal and financial information (*Protecting Personal Information: A Guide for Business*, (Oct. 2016)), which includes basic security standards applicable to all types of businesses and higher education institutions.

65.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses and higher education institutions must take to meet their data security obligations.

66.     Because Defendant was entrusted with Plaintiff's and Class Members' PII, they had and have a duty to keep the PII secure.

67.     Plaintiff and Class Members reasonably expect that when they entrusted their PII to CCC it will safeguard their information.

68.     Despite Defendant's obligations, Defendant failed to appropriately monitor and maintain their data security systems in a meaningful way so as to prevent the Data Breach.

69.     Had Defendant properly maintained their systems and adequately protected them, they could have prevented the Data Breach.

**E.  Defendant Violated its Common Law Duty of Reasonable Care**

70.     Defendant was aware of the importance of security in maintaining personal information (particularly sensitive personal information like the PII involved here), and the value consumers place on keeping its PII secure.

71.     In addition to obligations imposed by federal and state law, Defendant owed and continues to owe a common law duty to Plaintiff and Class Members—who entrusted Defendant with their PII—to exercise reasonable care in receiving, maintaining, and storing, the PII in Defendant's possession.

72.     Defendant owed and continues to owe a duty to prevent Plaintiff's and Class Members' PII from being compromised, lost, stolen, accessed, or misused by unauthorized third parties. An essential part of Defendant's duty was (and is) the obligation to provide reasonable security consistent with current industry best practices and requirements, and to ensure information technology systems and networks, in addition to the personnel responsible for those systems and networks, adequately protected and continue to protect Plaintiff's and Class Members' PII.

73.     Defendant owed a duty to Plaintiff and Class Members, who entrusted Defendant with extremely sensitive PII to design, maintain, and test the information technology systems that housed Plaintiff's and Class Members' PII, to ensure that the PII in Defendant's possession was adequately secured and protected.

74.     Defendant owed a duty to Plaintiff and Class Members to create, implement, and maintain reasonable data security practices and procedures sufficient to protect the PII stored in Defendant's systems. In addition, this duty also required CCC to adequately train its employees and others with access to Plaintiff's and Class Members' PII on the procedures and practices necessary to safeguard such sensitive information. This duty also required supervision, training, and compliance on CCC's part to ensure that it complied with creating, implementing, and maintaining reasonable data security practices and procedures sufficient to protect Plaintiff's and Class Members' PII.

75.     Defendant owed a duty to Plaintiff and Class Members to implement processes that would enable Defendant to timely detect a breach of its information technology systems, and a duty to act upon any data security warnings or red flags detected by such systems in a timely fashion.

76.     Defendant owed a duty to Plaintiff and Class Members to disclose when and if its information technology systems and data security practices were not sufficiently adequate to protect and safeguard Plaintiff's and Class Members' PII.

77.     As the Notice of Data Security Event states, "[u]pon discovery" of the "unauthorized access," CCC immediately "began working with its IT team, and third-party forensic and legal specialists were engaged to conduct a full forensic investigation." CCC could have—and should have—taken these steps *beforehand* to protect the PII in its possession and prevent the Data Breach from occurring, as required under the common law, FTC guidelines, as well as other state and federal law and/or regulations.

78.     Thus, Defendant owed a duty to Plaintiff and Class Members to timely disclose the fact that a data breach, resulting in unauthorized access to their PII, had occurred.

79.     Defendant violated these duties. The Notice Letter and Notice of Data Security Event further states that CCC became aware of the Data Breach on March 7, 2023, however Plaintiff and Class Members, and the public did not learn of the Data Breach until May 15, 2023, when the Notice Letters were mailed out. Defendant failed to publicly describe the full extent of the Data Breach and notify affected parties. This demonstrates that CCC did not properly implement measures designed to timely detect a data breach of its information technology systems, as required to adequately safeguard Plaintiff's and Class Members' PII.

80.     Defendant also violated its duty to create, implement, and maintain reasonable data security practices and procedures sufficient to protect Plaintiff's and Class Members' PII.

81.     CCC breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. CCC's unlawful conduct includes, but is not limited to, the following acts and/or

omissions:

- Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;
- Failing to adequately protect customers' PII;
- Failing to properly monitor its own data security systems for existing intrusions;
- Failing to ensure that its vendors with access to its computer systems and data employed reasonable security procedures;
- Failing to detect unauthorized ingress into its systems;
- Failing to implement and monitor reasonable network segmentation to detect unauthorized travel within its systems, including to and from areas containing the most sensitive data;
- Failing to detect unauthorized exfiltration of the most sensitive data on its systems;
- Failing to train its employees in the proper handling of emails containing PII and maintain adequate email security practices;
- Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;
- Failing to adhere to industry standards for cybersecurity as discussed above; and
- Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private PII.

82.    CCC negligently and unlawfully failed to safeguard Plaintiff's and Class Members PII by allowing cybercriminals to access its computer network which contained unsecured and unencrypted PII.

83.    Had CCC remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, CCC could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

84.    However, due to CCC's failures, Plaintiff and Class Members now face an increased risk of fraud and identity theft. In addition, Plaintiff and the Class Members also lost the benefit of the bargain they made with CCC.

**F. CCC Knew or Should Have Known that Criminals Target PII and the Data Breach was Foreseeable and Preventable**

17

85.    Defendant was well aware that the protected PII it acquires, stores, and utilizes is highly sensitive and of significant value to the owners of the PII and those who would use it for wrongful purposes.

86.    PII is a valuable commodity to identity thieves, particularly when it is aggregated in large numbers.  Former United States Attorney General William P. Barr made clear that consumers' sensitive personal information commonly stolen in data breaches "has economic value."  The purpose of stealing large caches of personal data is to use it to defraud individuals or to place it for illegal sale and to profit from other criminals who buy the data and use it to commit fraud and identity theft. Indeed, cybercriminals routinely post stolen personal information on anonymous websites, making the information widely available to a criminal underworld.

87.    There is an active and robust market for this information. As John Sancenito, president of *Information Network Associates*, a company which helps companies with recovery after data breaches, explained after a data breach "[m]ost of the time what [data breach hackers] do is they steal the data and then they sell the data on the dark web to the people who actually commit the fraud."

88.    PII is a valuable property right.[4] The value of Private Information as a commodity is measurable.[5] "Firms are now able to attain significant market valuations by employing business

---

[4]    *See* Marc van Lieshout, *The Value of Personal Data*, 457 IFIP ADVANCES IN INFORMATION AND COMMUNICATION TECHNOLOGY 26 (May 2015), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible[.]") (last visited Feb. 24, 2023).

[5]    *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192 (last visited Feb. 24, 2023).

models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[6] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[7] Private Information is so valuable to identity thieves that once Private Information has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

89.      As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, SSNs, PII, and other sensitive information directly on various Internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

90.      The forms of PII involved in this Data Breach are particularly concerning and are a prime target for cybercriminals.

91.      ***Social Security numbers***—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Social Security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

---

[6]      *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD 4 (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en (last visited Feb. 24, 2023).

[7]      *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERTISING BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/ (last visited Feb. 24, 2023).

92.    Indeed, even the Social Security Administration warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.

93.    Social Security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often Social Security numbers can be used to obtain goods or services. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes Social Security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

94.    The ramifications of Defendant's failure to keep Plaintiff's and Class Members' PII secure are long lasting and severe.  To avoid detection, identity thieves often hold stolen data for months or years before using it.  Also, the sale of stolen information on the "dark web" may take months or more to reach end-users, in part because the data is often sold in small batches as opposed to in bulk to a single buyer.  Thus, Plaintiff and Class Members must vigilantly monitor their accounts *ad infinitum*.

95.     Thus, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it and of the foreseeable consequences if its systems were breached.  Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

96.     As a highly sophisticated party that handles sensitive PII, Defendant failed to establish and/or implement appropriate administrative, technical and/or physical safeguards to ensure the security and confidentiality of Plaintiff's and other Class Members' PII to protect against anticipated threats of intrusion of such information.

97.     Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.

98.     Identity thieves can also use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, and/or rent a house or receive medical services in the victim's name.

99.     Moreover, theft of Private Information is also gravely serious because Private Information is an extremely valuable property right.[8]

---

[8]     *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally*

100.    PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

101.    There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

102.    The PII exfiltrated in the Data Breach can also be used to commit identity theft by placing Plaintiff and Class Members at a higher risk of "phishing," "vishing," "smishing," and "pharming," which are which are other ways for cybercriminals to exploit information they already have in order to get even more personally identifying information from a person through unsolicited email, text messages, and telephone calls purportedly from a legitimate company requesting personal, financial, and/or login credentials.

103.    There is often a lag time between when fraud occurs versus when it is discovered, as well as between when PII is stolen and when it is used. According to the *U.S. Government Accountability Office*, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

104.    Personal information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the cyber black

---

*Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted) (last accessed Feb. 24, 2023).

market for years. Indeed, a social security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[9] "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[10]

105.    Plaintiff and Class Members rightfully place a high value not only on their PII, but also on the privacy of that data.

106.    Thus, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to PII, they *will use it.*

107.    Data breaches are preventable. As Lucy Thompson wrote in the *Data Breach and Encryption Handbook*, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions." She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised…" and "[m]ost of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures…Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."

108.    The types of PII, such as Social Security and driver's license numbers, compromised in the Data Breach are immutable. Plaintiff and Class Members are not able to

---

[9]    Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, Nov. 15, 2017, https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web    (last accessed Feb. 24, 2023).

[10]    *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/ (last accessed Feb. 24, 2023).

change them or simply cancel them, like a credit card, to avoid harm or fraudulent use of the information. Just like a birthdate or a mother's maiden name, these pieces of information cannot be changed by logging into a website and changing them in settings, and they can be used alone or in conjunction with other pieces of Plaintiff's and Class Members' information to commit serious identity theft and fraud.

109.    The Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[11] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. *Id.* at 4. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

110.    An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[12]

---

[11]    *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, Nov. 2, 2017, https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/ (emphasis added) (last accessed Feb. 24, 2023).

[12]    Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last accessed Feb. 24, 2023).

111.    Victims of the Data Breach, like Plaintiff and Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their privacy and credit because of the Data Breach.

112.    As a direct and proximate result of the Data Breach, Plaintiff and Class Members have had their PII exposed, have suffered harm as a result, and have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. Plaintiff and Class Members must now take the time and effort (and spend the money) to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services every year for the rest of their lives, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, and credit reports for unauthorized activity for years to come.

**G.  Plaintiff and Class Members Suffered Harm as a Result of the Data Breach**

113.    The ramifications of Defendant's failure to keep PII secure are long-lasting and severe. Victims of data breaches are more likely to become victims of identity fraud, occurring 65 percent of the time.  In 2019 alone, consumers lost more than $1.9 billion to identity theft and fraud.

114.    Besides damage sustained in the event of identity theft, consumers may also spend anywhere from approximately 7 hours to upwards to over 1,000 hours trying to resolve identity theft issues.  The Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems."

115.    Plaintiff's PII was provided to CCC in conjunction with the type of work CCC performs as a debt collector. In requesting and maintaining Plaintiff's PII, CCC promised, and undertook a duty, to act reasonably in its handling of Plaintiff's PII. CCC, however, did not take proper care of Plaintiff's PII, leading to its exposure to and exfiltration by cybercriminals as a direct result of CCC's inadequate data security measures.

116.    On or around May 15, 2023, CCC sent Plaintiff notice concerning the Data Breach. The letter stated that CCC experienced a data breach, and that the incident may have resulted in unauthorized access to Plaintiff's personal information stored on CCC's systems. According to CCC, the compromised data included highly-sensitive information: first and last names, patient account balances, dates of medical service, names of medical providers, patient account numbers and Social Security numbers. The notice further encouraged Plaintiff "remain vigilant in regularly reviewing and monitoring all of your account statements and credit history to guard against any unauthorized transactions or activity." CCC also offered certain credit monitoring services through Kroll, but only for a period of 12 months.

117.    As a result of CCC's conduct and failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect consumers' PII, which allowed the Data Breach to occur, Plaintiff's PII has been and is now in the hands of unauthorized individuals and third parties, which may include thieves, unknown criminals, banks, credit companies, and other potentially hostile individuals.

118.    Plaintiff greatly values her privacy, especially her highly-sensitive information, such as her Social Security numbers and medical data. She would not have entrusted a healthcare provider that entrusted CCC with this highly-sensitive information had she known that CCC would negligently fail to adequately protect her PII. Indeed, Plaintiff provided her highly-sensitive

information with the expectation that CCC would keep their PII secure and inaccessible from unauthorized parties.

119.    As a result of CCC's failure to implement and follow even the most basic security procedures, Plaintiff suffered actual damages including, without limitation, time and expenses related to monitoring their financial accounts for fraudulent activity, exposure to increased and imminent risk of fraud and identity theft, the loss in value of their personal information, and other economic and non-economic harm. Plaintiff will now be forced to expend additional time to review their credit reports and monitor their financial accounts and medical records for fraud or identify theft—particularly since the compromised information may include Social Security numbers.

120.    Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff will need to maintain these heightened measures for years, and possibly their entire lives.

121.    Plaintiff is also at a continued risk of harm because their PII remains in CCC's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as CCC fails to undertake the necessary and appropriate data security measures to protect the PII in its possession.

122.    As a result of the Data Breach, and in addition to the time Plaintiff has spent and anticipate spending to mitigate the impact of the Data Breach on their lives, Plaintiff has also suffered emotional distress from the public release of their PII, which they believed would be protected from unauthorized access and disclosure. The emotional distress they have experienced includes anxiety and stress resulting from the fear that unauthorized bad actors are viewing, selling, and or using their PII for the purposes of identity theft and fraud.

123.    Additionally, Plaintiff has suffered damage to and diminution in the value of her highly sensitive and confidential PII—a form of property that Plaintiff entrusted to CCC and which was compromised as a result of the Data Breach CCC failed to prevent. Plaintiff has also suffered a violation of their privacy rights as a result of CCC's unauthorized disclosure of their PII.

## CLASS ACTION ALLEGATIONS

124.    Plaintiff brings this case individually and, pursuant to Rule 23(b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure, on behalf of the following class:

> All persons whose PII was compromised in the Data Breach that was discovered by CCC on or around March 7, 2023.

125.    Excluded from the Class are Defendant, their subsidiaries and affiliates, their officers, directors and members of their immediate families and any entity in which Defendant have a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

126.    Plaintiff reserves the right to modify or amend the definition of the proposed Class, if necessary, before this Court determines whether certification is appropriate.

127.    Numerosity: The requirements of Rule 23(a)(1) are satisfied. The Class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court. As noted above, there are approximately 286,000 Class Members.

128.    The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendant's records, including but not limited to, the information implicated in the Data Breach.

129.    Commonality: The requirements of Rule 23(a)(2) are satisfied. There is a well-defined community of interest and there are common questions of fact and law affecting Class Members. The questions of fact and law common to the Class predominate over questions which may affect individual members and include the following:

a.    Whether and to what extent Defendant had a duty to secure and protect the PII of Plaintiff and Class Members;

b.    Whether Defendant were negligent in collecting and disclosing Plaintiff's and Class Members' PII;

c.    Whether Defendant had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

d.    Whether Defendant took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII;

e.    Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

f.    Whether Defendant breached their duties to exercise reasonable care in handling Plaintiff's and Class Members' PII in the manner alleged herein, including failing to comply with industry standards;

g.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.    Whether Defendant had respective duties not to use the PII of Plaintiff and Class Members for non-business purposes;

i.      Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

j.      Whether Plaintiff and Class Members are entitled to declaratory judgment under 28 U.S.C. § 2201, *et seq.*;

k.      Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

l.      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

130.    Typicality: The requirements of Rule 23(a)(3) are satisfied. Plaintiff's claims are typical of the claims of Class Members. The claims of the Plaintiff and Class Members are based on the same legal theories and arise from the same failure by Defendant to safeguard PII. Plaintiff and Class Members each had their PII disclosed by Defendant to an unauthorized third party.

131.    Adequacy: The requirements of Rule 23(a)(4) are satisfied. Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class Members. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of Class Members and have no interests antagonistic to the Class Members. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation, including data breach litigation. The claims of Plaintiff and Class Members are substantially identical as explained above. While the aggregate damages that may be awarded to the Class Members are likely to be substantial, the damages suffered by the individual Class Members are relatively small. As a result, the expense and burden of individual litigation make it economically infeasible and procedurally impracticable for each member of the Class to individually seek redress for the wrongs done to them. Certifying the case as a class will centralize these substantially

identical claims in a single proceeding, which is the most manageable litigation method available to Plaintiff and the Class and will conserve the resources of the parties and the court system, while protecting the rights of each member of the Class. Defendant's uniform conduct is generally applicable to the Class as a whole, making relief appropriate with respect to each Class Member.

132.    Here a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims. There will be no difficulty in managing this action as a class action, and the disposition of the claims of the Class members in a single action will provide substantial benefits to all parties and to the Court. Damages for any individual Class Member are likely insufficient to justify the cost of individual litigation so that, in the absence of class treatment, Defendant's violations of law inflicting damages in the aggregate would go un-remedied.

133.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

  a.    Whether Defendant owed a legal duty to Plaintiff and the Classes to exercise due care in collecting, storing, using, and safeguarding their PII;

  b.    Whether Defendant's data security practices were reasonable in light of best practices recommended by data security experts;

  c.    Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

d.      Whether Defendant failed to take commercially reasonable steps to safeguard consumer PII; and

e.      Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

134.    Finally, all members of the proposed Classes are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. At least some Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

135.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

136.    CCC owed a duty to Plaintiff and all other Class Members to exercise reasonable care in safeguarding and protecting their PII in its possession, custody, or control.

137.    CCC knew, or should have known, the risks of collecting and storing Plaintiff's and all other Class Members' PII and the importance of maintaining secure systems. CCC knew, or should have known, of the vast uptick in data breaches in recent years. CCC had a duty to protect the PII of Plaintiff and Class Members.

138.    Given the nature of CCC's business, the sensitivity and value of the PII it maintains, and the resources at its disposal, CCC should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring, which CCC had a duty to prevent.

139.    CCC breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt, implement, control,

direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to it—including Plaintiff's and Class Members' PII.

140.    It was reasonably foreseeable to CCC that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class Members' PII to unauthorized individuals.

141.    But for CCC's negligent conduct/breach of the above-described duties owed to Plaintiff and Class Members, their PII would not have been compromised.

142.    As a result of CCC's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) actual or attempted fraud.

## COUNT II
## NEGLIGENCE *PER SE*
### (On Behalf Plaintiff and the Class)

143.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

144.    CCC's duties arise from Section 5 of the FTCA ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by a business, such as CCC, of failing to employ reasonable measures to protect and secure PII.

145.    CCC violated Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and all other Class Members' PII and not complying with applicable industry standards. CCC's conduct was particularly unreasonable given the nature and amount of PII it obtains and stores, and the foreseeable consequences of a data breach involving PII including, specifically, the substantial damages that would result to Plaintiff and the other Class Members.

146.    CCC's violations of Section 5 of the FTCA constitutes negligence *per se*.

147.    Plaintiff and Class Members are within the class of persons that Section 5 of the FTCA was intended to protect.

148.    The harm occurring as a result of the Data Breach is the type of harm Section 5 of the FTCA was intended to guard against.

149.    It was reasonably foreseeable to CCC that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class Members' PII to unauthorized individuals.

150.     The injury and harm that Plaintiff and the other Class Members suffered was the direct and proximate result of CCC's violations of Section 5 of the FTCA. Plaintiff and Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vi) actual or attempted fraud.

### COUNT III
### BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiff and the Class)

151.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

152.     Plaintiff and Class Members either directly or indirectly gave CCC their PII in confidence, believing that CCC – a sophisticated debt collector – would protect that information. Plaintiff and Class Members would not have provided CCC with this information had they known it would not be adequately protected. CCC's acceptance and storage of Plaintiff's and Class Members' PII created a fiduciary relationship between CCC and Plaintiff and Class Members. In light of this relationship, CCC must act primarily for the benefit of its customers and students, which includes safeguarding and protecting Plaintiff's and Class Members' PII.

153.     CCC has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of their relationship. It breached that duty by failing to properly

35

protect the integrity of the system containing Plaintiff's and Class Members' PII, failing to comply with the data security guidelines set forth by Section 5 of the FTCA, and otherwise failing to safeguard the PII of Plaintiff and Class Members it collected.

154.    As a direct and proximate result of CCC's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in CCC's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) actual or attempted fraud.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

155.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein. This claim is pled in the alternative to all of the contract based claims pursuant to Fed. R. Civ. P. 8(d)(2).

156.    Plaintiff and Class Members conferred a monetary benefit upon CCC in the form of debt collected by CCC.

157.    CCC accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. CCC also benefitted from the receipt of Plaintiff's and Class Members' PII.

158.    As a result of CCC's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their payments made with

reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

159.    CCC should not be permitted to retain the money belonging to Plaintiff and Class Members because CCC failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class Members paid for and that were otherwise mandated by federal, state, and local laws. and industry standards.

160.    CCC should be compelled to provide for the benefit of Plaintiff and Class Members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

**COUNT V**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf Plaintiff and the Class)**

161.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

162.    Defendant required Plaintiff and Class Members to provide, or authorize the transfer of, their PII in order for CCC to provide services. In exchange, CCC entered into implied contracts with Plaintiff and Class Members in which CCC agreed to comply with its statutory and common law duties to protect Plaintiff's and Class Members' PII and to timely notify them in the event of a data breach.

163.    Plaintiff and Class Members would not have provided their PII to Defendant had they known that Defendant would not safeguard their PII, as promised, or provide timely notice of a data breach.

164.    Plaintiff and Class Members fully performed their obligations under their implied contracts with Defendant.

165.    Defendant breached the implied contracts by failing to safeguard Plaintiff's and Class Members' PII and by failing to provide them with timely and accurate notice of the Data Breach.

166.    The losses and damages Plaintiff and Class Members sustained (as described above) were the direct and proximate result of Defendant's breach of its implied contracts with Plaintiff and Class Members.

## COUNT VI
### BREACH OF CONTRACTS TO WHICH PLAINTIFF AND CLASS MEMBERS WERE INTENDED THIRD PARTY BENEFICIARIES
#### (On Behalf of Plaintiff and the Class)

167.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

168.    CCC had valid contracts to provide debt collection services to Sentara Health System and other healthcare systems. A principal purpose of those contracts was to securely store, transmit and safeguard the private information of Plaintiffs and class members.

169.    Plaintiffs and class members are intended third party beneficiaries of these agreements because recognizing them as such is appropriate to effectuate the intentions of the parties, and the circumstances indicate that CCC intended to give the beneficiaries the benefit of the promised performance.

170.    CCC breached these contractual obligations by allowing the data breach to occur, and as otherwise set forth herein.

171.    CCC's breach caused foreseeable and material damages to Plaintiffs and class members.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff on behalf of herself and all others similarly situated, prays for relief as follows:

(a)     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

(b)     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(c)     For damages, including all compensatory, punitive, and/or nominal damages, in an amount to be determined by the trier of fact;

(d)     For an order of restitution and all other forms of equitable monetary relief;

(e)     Declaratory and injunctive relief as described herein;

(f)     Awarding Plaintiff reasonable attorneys' fees, costs, and expenses;

(g)     Awarding pre- and post-judgment interest on any amounts awarded; and

(h)     Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

A jury trial is demanded on all claims so triable.

Dated: May 30, 2023                    Respectfully submitted,


/s/David Hilton Wise
David Hilton Wise, VA Bar No. 30828
Joseph M. Langone, VA Bar No. 43543
WISE LAW FIRM PLC
10640 Page Avenue, Suite 320
Fairfax, Virginia 22030
Phone: 703-934-6377

dwise@wiselaw.pro
jlangone@wiselaw.pro

**SHUB & JOHNS LLC**
Jonathan Shub*
Benjamin F. Johns*
Samantha E. Holbrook*
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
(610) 477-8380
jshub@shublawyers.com
bjohns@shublawyers.com
sholbrook@shublawyers.com

*Attorneys for Plaintiff and the Proposed Class*

*Pro Hac Vice Forthcoming*